STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,

v.

Jean M. CALDWELL, Respondent.

OBAD No. 911.
SCBD No. 3582.

Supreme Court of Oklahoma.

May 24, 1994.

Gloria Miller White, Asst. Gen. Counsel, Oklahoma Bar Ass'n, Oklahoma City, for complainant.

Jean M. Caldwell, Tulsa, *pro se*.

OPALA, Justice.

In this disciplinary proceeding against a lawyer, the issues to be decided are: (1) Is the record[1] sufficient for a meaningful *de novo* consideration of the complaint's disposition? and (2) Is a two-year-and-one-day suspension with imposition of costs, to be effective from November 30, 1989 (the date on which respondent took associate-member status), an appropriate disciplinary sanction to be imposed for respondent's breach of professional discipline? We answer both questions in the affirmative.

The Oklahoma Bar Association [Bar] charged Jean M. Caldwell [respondent] with two counts of professional misconduct. Respondent denied most of the material allegations in the complaint. Nine months later, on November 30, 1989, she voluntarily changed her bar status from "active" to "associate."[2] Before a hearing could be had, the Bar pressed for dismissal of its complaint on the ground that as an associate respondent was no longer able to practice law. A panel of the PRT recommended on September 11, 1990 that the complaint be dismissed. This court *declined to terminate the case and remanded it to the PRT panel whence it came for adversary hearings upon the counts charging respondent with professional misconduct.* Following a hearing, the PRT panel made findings of fact and conclusions of law together with a recommendation for discipline.[3] It ruled that respondent's conduct violated Rules DR 1–102(A)(1)(4)(5)(6), 7–101(A)(1)(3), 7–102(A)(1)(2)(3)(5) of the Oklahoma Code of Professional Responsibility,[4] and Rule 5.2 of

1. The record consists of a transcript of the PRT's hearing and of the *Stipulated Findings of Fact and Conclusions of Law and Agreed Recommendation for Discipline.* The latter, submitted by respondent and the Oklahoma Bar Association, was rejected by the PRT.

2. Art. II, § 2, Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S.Supp.1983, Ch. 1, App. 1, provides in part that:
   "Members of the Association shall be divided into three classes, namely (a) active members, (b) senior members, and (c) associate members. No other categories of membership may be allowed....

   \* \* \* \* \* \*

   "(c) **Associate Member.** A member in good standing who files, or on whose behalf there is filed, with the Executive Director, a *statement that, by reason of illness, infirmity, or other disability*, he is unable to engage in the practice of law shall become an associate member of the Association for the duration of such illness, infirmity or other disability and until he is resorted to his former classification. An associate member shall not engage in the practice of law.... The member, on causing an appropriate showing thereof to be made to the Executive Director, shall be reclassified to the membership held prior to such illness, infirmity or other disability...." (Emphasis added.)
   An *erroneous text* in the 1992 Supplement to the Oklahoma Statutes indicates that these classifications have been changed. *See* Art. II, § 2, Rules Creating and Controlling the Oklahoma Bar Association, 5 O.S.Supp.1992, Ch. 1, App. 1–A.

3. *With respondent's concurrence*, the Bar recommended that she be suspended from the practice of law for two years and that the period begin to run from November 30, 1989, the date on which she took associate-member status. The PRT re-

jected this recommendation, counseling that (a) the appropriate sanction should be a two-year-and-one-day suspension effective November 30, 1989 and that (b) if she desires reinstatement, she should be required to make formal application and to prove by clear and convincing evidence that she has been rehabilitated and is otherwise qualified under Rules 11.4 and 11.5, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A, *infra* note 23.

4. 5 O.S.1981, Ch. 1, App. 3–A (superseded by the Oklahoma Rules of Professional Conduct, 5 O.S.Supp.1988, Ch. 1, App. 3–A, eff. July 1, 1988). The Code of Professional Responsibility will be used throughout our determination of any misconduct since it was in force during the time of the events that gave rise to the complaint.
   Rule DR 1–102(A) provided in part:
   "(A) A lawyer shall not:
      (1) Violate a Disciplinary Rule.

      \* \* \* \* \* \*

      (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
      (5) Engage in conduct that is prejudicial to the administration of justice.
      (6) Engage in any other conduct that adversely reflects on his fitness to practice law."
   Rule DR 7–101(A) provided in part:
   "A lawyer shall not intentionally:
      (1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B).

      \* \* \* \* \* \*

      (3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B)."
   Rule DR 7–102 provided in pertinent part:
   "(A) In his representation of a client, a lawyer shall not:

the Rules Governing Disciplinary Proceedings.[5]

### The Bar's Dismissal Quest

The Bar, whose earlier quest for dismissal of this complaint proved unsuccessful, once again attempted to press for dismissal of certain allegations during the adversary hearings that followed this court's reinstatement order. We reaffirm the panel's reluctance to act on the renewed Bar attempt to dismiss.

█ Once a disciplinary prosecution has been initiated, it can be terminated *only* by this court upon its *de novo* review of the proceedings.[6] The Bar counsel does not

> (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.
> (2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law.
> (3) Conceal or knowingly fail to disclose that which he is required by law to reveal.
>
>     \*    \*    \*    \*    \*    \*˙
>
> (5) Knowingly make a false statement of law or fact. \* \* \* "

5. The pertinent terms of Rule 5.2, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A, state:

> "After making such preliminary investigation as the General Counsel may deem appropriate, the General Counsel shall ... (2) file and serve a copy of the grievance ... upon the lawyer, who shall thereafter make a written response which contains a full and fair disclosure of all the facts and circumstances pertaining to the lawyer's alleged misconduct unless the respondent's refusal to do so is predicated upon expressed constitutional grounds.... *The failure of a lawyer to answer within twenty (20) days after service of the grievance (or recital of facts or allegations), or such further time as may be granted by the General Counsel, shall be grounds for discipline.*" (Emphasis added.)

6. *State ex rel. Oklahoma Bar Ass'n v. Glass,* Okl., 832 P.2d 831, 832, 834 (1992); *State ex rel. Oklahoma Bar Ass'n v. Stephenson,* Okl., 798 P.2d 1078, 1079 (1990); *State ex rel. Oklahoma Bar Ass'n v. Downing,* Okl., 804 P.2d 1120, 1122–1123 (1991); *State ex rel. Oklahoma Bar Ass'n v. Landman,* Okl., 784 P.2d 1064 (1989); *State ex rel. Oklahoma Bar Ass'n v. Hall,* Okl., 781 P.2d

have the power of *nolle prosequi*—the common-law prerogative of an English prosecutor to dismiss a Crown's criminal charge.[7]

█ Our *de novo* review must rest either on evidence adduced in an adversary proceeding or on that revealed by stipulated facts. While the Bar (or the parties by agreement) may request a dismissal of a count or of some allegation in the complaint,[8] it *is powerless to withdraw a filed complaint either in whole or in part. The authority to terminate a disciplinary proceeding resides solely in the Supreme Court.*[9]

### Professional Incapacity

The Bar's initial dismissal quest was premised upon respondent's change to an associ-

821, 822 (1989); *State ex rel. Oklahoma Bar Ass'n v. Braswell,* Okl., 663 P.2d 1228, 1229–1230 (1983); *State ex rel. Oklahoma Bar Ass'n v. Hood,* Okl., 406 P.2d 978, 979 (1965); *State ex rel. Oklahoma Bar Ass'n v. Taylor,* Okl., 302 P.2d 975, 976 (1956).

In *Tweedy v. Oklahoma Bar Ass'n,* Okl., 624 P.2d 1049, 1054 (1981), the court recognized that in bar discipline cases the exercise of prosecutorial power is similar to that of an Oklahoma grand jury. Once a person has been indicted, the prosecutor cannot dismiss the charges without the court's approval. 22 O.S.1991 § 816; *State v. Robinson,* Okl.Cr., 544 P.2d 545, 548 (1975); Rule 6.1, Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A.

7. *Nolle prosequi* means "a formal entry on the record by the prosecuting officer by which he declares he will not prosecute the case further." Black's Law Dictionary, p. 945 (5th ed. 1979). *State v. Jackson,* 420 So.2d 320, 321–322 (Fla.App.1982); *State ex rel. Skinner v. Dostert,* 166 W.Va. 743, 278 S.E.2d 624, 629 (1981); *State v. Lomax,* 712 S.W.2d 698, 700 (Mo.App. 1986) (Pudlowski, J., concurring); *People v. Covelli,* 415 Ill. 79, 112 N.E.2d 156, 159–160 (1953); *Ward v. State,* 290 Md. 76, 427 A.2d 1008, 1011–1012 (App.1981); *see also* comment in *State ex rel. Derryberry v. Kerr–McGee Corporation,* Okl., 516 P.2d 813, 818–819 (1973).

8. In *Glass, Stephenson, Downing, Landman, Hall, Braswell, Hood* and *Taylor, supra* note 6, upon its *de novo* review, the court approved the parties' quest for dismissal.

9. In State ex rel. Oklahoma Bar Ass'n v. Copeland, SCBD 3784 (order of Dec. 9, 1991), the court denied the Bar's motion to withdraw its complaint and remanded the case for adversary proceedings. On *de novo* review we disciplined the respondent by a public reprimand and impo-

ate-member status which bars her from active practice.[10]

■ A lawyer can become an associate member of the Bar *by filing a statement with the Executive Director explaining that because of an "illness, infirmity, or other disability" she/he is prevented from practising law.*[11] The respondent's voluntary status change cannot shield her from professional responsibility for misconduct charged in a then-pending complaint.[12] Once a formal complaint has been brought, it is this court's constitutional duty to ensure that the goals of lawyer discipline are carried out. These goals—(1) preservation of public trust and confidence in the Bar by strict enforcement of the profession's integrity, (2) protection of the public and the courts and (3) deterrence of like behavior by both the disciplined lawyer and by other members of the Bar[13]— would indeed be defeated if respondent were allowed to find a sanctuary from discipline for her past professional misconduct by shrouding herself in associate-member status.

## FACTS ADMITTED BY STIPULATION[14]
### COUNT I

■ Virginia Plummer retained respondent in June 1983 to represent her in a proceeding to modify child support, to commute unpaid child support to judgment and to secure a counsel-fee award for services in a contempt citation. Her former spouse, Phillip Plummer [Plummer], retained James Hayes [Hayes]. Hayes would testify that he and respondent agreed to pass until later the scheduled September 1, 1983 hearing. Respondent would relate that she has no recollection of the agreement. Respondent appeared at the September 1 hearing and was given a judgment of $2,061.25 for child support arrearage, dental and medical expenses, attorney's fee and costs. Hayes and his client did not appear. *On September 6, 1983 Hayes obtained an order vacating the earlier decision, which he mailed to respondent.*

On July 10, 1985 respondent filed a garnishment proceeding against Plummer to recover the amount of the September 1 judgment. Plummer's employer withheld $405.67 from his wages. After learning about the garnishment, Plummer went to respondent's office but was unable to find her there. He then had a discussion with her secretary who prepared for his signature a promissory note by which he agreed to pay $2,246.00 in monthly installments of $50.00 each in return for respondent's release of the garnishment process. Plummer signed the note and paid $50.00.

Apparently in response to a grievance, respondent represented to the General Counsel on September 30, 1986 that she did not "file

---

sition of costs. For the disposition of this disciplinary matter, see *State of Oklahoma ex rel. Oklahoma Bar Association v. Copeland,* Okl., 870 P.2d 776 (1994).

**10.** For the rules governing associate-member status, see *supra* note 2.

**11.** *See* Art. II, § 2, *supra* note 2.

**12.** Rule 10 (Suspension For Personal Incapacity To Practice Law), Rules Governing Disciplinary Proceedings, 5 O.S.1991, Ch. 1, App. 1–A. *State ex rel. Okl. Bar Ass'n v. Donnelly,* Okl., 848 P.2d 543, 545 (1992). A disability in the Rule 10 sense may constitute a mitigating factor when searching for suitable discipline.

**13.** *State ex rel. Oklahoma Bar Ass'n v. Rozin,* Okl., 824 P.2d 1127, 1130 (1991).

**14.** The Stipulated Findings of Fact and Conclusions of Law and Agreed Recommendation for Discipline contains several references to the Tulsa County Bar Association's Grievance Committee and its interaction with respondent.

Rule 3.2(h), Rules Governing Disciplinary Matters, 5 O.S.1991, Ch. 1, App. 1–A, states in pertinent part:
"Rule 3.2 **Duties.**
   The General Counsel of the Oklahoma Bar Association shall have the following powers and duties in the area of discipline under these Rules:
                *    *    *    *    *    *
(h) To use the services of other members of the Oklahoma Bar Association (including, but not limited to, any state or county Bar grievance committee) in carrying out the duties imposed upon the General Counsel concerning the general supervision of all disciplinary matters affecting lawyers."
There is nothing in this record to indicate that the Office of the General Counsel sought the assistance of the Tulsa County Bar Association's Grievance Committee. No sanction can hence attach to respondent's failure to cooperate with the local bar's committee. For an example of the General Counsel's proper use of a county bar association's grievance committee services, see *Hood, supra* note 6, 406 P.2d at 979.

354

any illegal garnishment" or fail to release "that proper garnishment." In so doing *she failed to disclose in her written response that she had, in fact, been informed of the September 1 ruling's vacation.*

## COUNT II

Because she could not properly care for them, Mrs. R., an Enid resident, voluntarily placed on February 13, 1985 two of her three children with the Department of Human Services [DHS] in Garfield County. Respondent had represented a couple that adopted her third child. On March 4, 1985 Mrs. R. told respondent she wanted to place her other two children for adoption. Two days later, Lola Robinson [Robinson], who was working in respondent's office, notified DHS of Mrs. R's plans. Meanwhile Robinson spoke on several occasions with Mr. and Mrs. Chambers [Chambers], Mississippi residents, about adopting the two children. She told them that they could pick up the children in Tulsa on March 11, 1985 and have their custody until the adoption proceedings became final.

On March 8, 1985 Mrs. R., respondent and Robinson went to DHS offices in Garfield County. Mrs. R. told the officials she wanted to keep her children and that she would take them to Tulsa where a job and a place to live would be provided for her. They all appeared before a judge in Tulsa County on March 11. There, Mrs. R. executed a written consent for the Chambers to adopt the children. That evening the Chambers met with respondent at her office in Tulsa and paid her $1,240 for services in the adoption proceedings. The Chambers took custody of the children and returned with them to Mississippi. They did this on respondent's advice that (a) it was legally permissible to do so, (b) the natural father had no legal rights in the matter and (c) he was not entitled to any notice of the adoption. Respondent failed to disclose or to advise them that it was necessary to file a petition for adoption in the county where the Chambers resided.

On March 12, 1985 respondent filed on behalf of the Chambers a petition for adoption in Tulsa County. She gave *no notice* of the proceeding to the natural father. Sometime later the Garfield County DHS officials notified the natural father that adoption proceedings had been commenced. The father retained a lawyer who entered an appearance in the case. On March 25, 1985 Mrs. Chambers returned to Tulsa to sign an amended adoption petition which joined the father as a party. Because Mr. Chambers did not accompany her, respondent signed his name to the pleading. Respondent filed the verified amended petition on the same day, impliedly representing to the district court that the signatures to the petition, including that of Mr. Chambers, were genuine. On March 29, 1985 respondent filed a notice of hearing on the amended petition along with her quest for a determination that the children were eligible for adoption without the consent of the natural father. She mailed this notice to the natural father at "General Delivery" in Kilgore, Texas.

Although the adoption proceedings were dismissed on April 29, 1985, respondent refused to advise the Chambers that they must return the children. Their natural father had to secure an order from the District Court in Garfield County directing that the children be returned. He then was compelled to travel to Mississippi to regain the children's actual custody.

## I

## THE RECORD BEFORE THE COURT IS COMPLETE FOR A *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

▆▆▆ The Oklahoma Supreme Court has exclusive original jurisdiction over Bar disciplinary proceedings.[15] The court's review is conducted by a *de novo* consideration of the case before it.[16] Neither the stipulations of

15. *State ex rel. Oklahoma Bar Ass'n v. Raskin,* Okl., 642 P.2d 262, 265 (1982); *Tweedy, supra* note 6, 624 P.2d at 1052; *In re Integration of State Bar of Oklahoma,* 185 Okl. 505, 95 P.2d 113, 114 (1939).

16. *State ex rel. Oklahoma Bar Ass'n v. Lloyd,* Okl., 787 P.2d 855, 858 (1990); *Oklahoma Bar Ass'n v. Stubblefield,* Okl., 766 P.2d 979, 982 (1988); *State ex rel. Oklahoma Bar Ass'n v. Cantrell,* Okl., 734 P.2d 1292, 1293 (1987); *Raskin, supra* note 15, 642 P.2d at 265–266. Because

the parties nor the PRT panel's findings (or assessments regarding the weight or credibility of the evidence) can bind this court.[17] In a *de novo* consideration, in which the court exercises its constitutionally invested, nondelegable power to regulate both the practice of law and the legal practitioners,[18] *a full-scale exploration of all relevant facts is mandatory.*[19]

█ The court's review task cannot be discharged unless the PRT panel submits a complete record of proceedings for a *de novo* examination of all pertinent issues. Our *first* responsibility is to ensure that the record is sufficient for a thorough inquiry into essential facts and for crafting the appropriate order of discipline [20] that would avoid the vice of visiting disparate treatment on the respondent-lawyer.[21]

The record in this case is adequate for our *de novo* consideration of respondent's alleged professional misconduct.

## II

### DISCIPLINE

The parties submit that respondent has been suspended from the practice of law *de facto* for a four-year period—ever since she took associate-member status on November 30, 1989—and that she has not practiced law since that time. Respondent testified she does not intend ever again to practice law.

The PRT found the facts submitted neither afford an explanation of the respondent's admitted misconduct nor mitigate its obvious gravity. It concluded that, in the absence of some explanation, respondent's misconduct—fraught with elements of dishonesty, fraud, deceit, misrepresentation, knowing abuse of legal process and failure to provide a fair, full and accurate disclosure in violation of Rule 5.2—was intentional and was made in disregard of a lawyer's fundamental obligation to the profession and to the public. *The PRT rejected the agreed recommendation* for a two-year suspension—one which, upon lapse of time, would permit respondent's automatic reinstatement.

## III

### A TWO–YEAR–AND–ONE–DAY SUSPENSION IS AN APPROPRIATE SANCTION FOR RESPONDENT'S PAST PROFESSIONAL MISCONDUCT

█ The court's responsibility in exercising its disciplinary jurisdiction is not to punish but *to inquire into the lawyer's continued fitness,* with a view to safeguarding the interest of the public, of the courts and of the legal profession.[22]

this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be supervised by *de novo* consideration. It is this very attribute *of nondelegable jurisdiction* that serves to distinguish bar review proceedings from a trial *de novo*—a retrial in a different court—or even from *de novo* appellate review on the record. The latter stands for an independent, non-deferential examination of *another tribunal's record.* Here, there is *no other tribunal,* only this court.

17. *Raskin, supra* note 15, 642 P.2d at 265.

18. *Raskin, supra* note 15, 642 P.2d at 266; *Tweedy, supra* note 6, 624 P.2d at 1052.

19. *State ex rel. Okl. Bar Ass'n v. Dugger,* Okl., 385 P.2d 486 (syllabus) (1963).

20. A complete record is essential for review of a bar disciplinary proceeding. The material to be reviewed is never to be deemed settled beyond our ability to expand it. The record always remains within this court's plenary power to expand by an order calling for its supplementation. *State ex rel. Okl. Bar Ass'n v. Moss,* Okl., 794 P.2d 403, 404 (1990); *State ex rel. Okl. Bar Ass'n v. Samara,* Okl., 683 P.2d 979, 983 (1984); *State ex rel. Okl. Bar Ass'n v. Warzyn,* Okl., 624 P.2d 1068, 1071 (1981). *See also State ex rel. Oklahoma Bar Ass'n v. Armstrong,* Okl., 791 P.2d 815, 816 (1990), which teaches that an *interim* suspension of a lawyer cannot be made on *an incomplete record.* The same problem confronted this court in *State ex rel. Okl. Bar Ass'n v. Lloyd,* SCBD No. 3455, received November 17, 1987 [*Lloyd I* ]. There, we declined to accept the trial authority's recommendation and returned the case for a full evidentiary hearing before the panel whence it came. For an explanation, see *Lloyd, supra* note 16, 787 P.2d at 856. [*Lloyd II* ].

21. *State ex rel. Okl. Bar Ass'n v. Perceful,* Okl., 796 P.2d 627, 630 (1990).

22. *Donnelly, supra* note 12, 848 P.2d at 545–546; *State ex rel. Okl. Bar Ass'n v. Colston,* Okl., 777 P.2d 920, 925 (1989); *Moss, supra* note 20, 682 P.2d at 207; *State ex rel. Okl. Bar Ass'n v. Harl-*

Respondent has been charged with (1) violating a disciplinary rule, (2) engaging in conduct involving dishonesty, fraud, deceit or misrepresentation, (3) engaging in conduct prejudicial to the administration of justice, (4) engaging in conduct that adversely reflects on her fitness to practice law, (5) intentionally failing to seek the lawful objectives of a client through reasonably available means allowed by law and by the disciplinary rules, (6) filing a suit on behalf of a client with knowledge that it would serve to harass or maliciously injure another, (7) advancing a position unwarranted by existing law, (8) concealing or failing to disclose that which she was required by law to reveal, (9) knowingly making a false statement of law or fact, (10) prejudicing or damaging her client during the course of their professional relationship and (11) failing to comply with the Rules Governing Disciplinary Proceedings by misrepresenting and/or failing to disclose material facts in response to a Bar investigation.

The facts admitted by respondent's stipulation, coupled with the findings of the PRT, plainly evidence that respondent's conduct is at odds with the standards of legal representation to which the public is entitled. On *de novo* review, the two counts of the Bar's complaint are found supported by clear and convincing record proof.

A lawyer's license is a certificate of professional fitness to deal with the public as a legal practitioner. *Public confidence in the practitioner is essential to the proper functioning of the profession.* A lawyer's misconduct adversely reflects on the entire Bar because it exhibits a lack of commitment to the clients' causes, to the courts, and to other members of the Bar. Respondent's actions call for the imposition of discipline.

On *de novo* review, the PRT's recommendation that respondent be suspended from the practice of law for two years and one day is accordingly approved. If she should desire reinstatement, she would be required to make formal application and show, by clear and convincing evidence, that she has been rehabilitated and is otherwise qualified for reinstatement under Rules 11.4 and 11.5, Rules Governing Disciplinary Proceedings.[23] *Within thirty days of the date of this opinion respondent shall pay the costs incurred in this proceeding in the amount of $256.28.*

Respondent stands suspended from the practice of law for two years and one day from November 30, 1989, the date she took associate-member status. As a precondition

---

ton, Okl., 669 P.2d 774, 777 (1983); *Raskin,* *supra* note 15, 642 P.2d at 267.

**23.** 5 O.S.1991, Ch. 1, App. 1–A.

The terms of Rule 11.4 are:

"An *applicant* for reinstatement must establish affirmatively that, if readmitted or if the suspension from practice is removed, the *applicant's conduct will conform to the high standards* required of a member of the Bar. The severity of the original offense and the circumstances surrounding it shall be considered in evaluating an application for reinstatement. The burden of proof, *by clear and convincing evidence,* in all such reinstatement proceedings *shall be on the applicant.* An *applicant seeking such reinstatement* will be required to present stronger proof of qualifications than one seeking admission for the first time. The proof presented must be sufficient to overcome the Supreme Court's former judgment adverse to the applicant. Feelings of sympathy toward the applicant must be disregarded. If applicable, restitution, or the lack thereof, by the applicant to an injured party will be taken into consideration by the Trial Panel on an application for reinstatement. Further, if applicable, the Trial Panel shall satisfy itself that the appli-

cant complied with Rule 9.1 of these Rules." (Emphasis added.)

The pertinent terms of Rule 11.5 are:

"At the conclusion of the hearing held on the petition for reinstatement, the Trial Panel of the Professional Responsibility Tribunal shall file a report with the Supreme Court, together with the transcript of the hearing. Said report shall contain specific findings upon each of the following:

(a) Whether or not the applicant possesses the *good moral character* which would entitle him to be admitted to the Oklahoma Bar Association;

(b) *Whether or not the applicant has engaged in any unauthorized practice of law* during the period of suspension, disbarment or resignation;

(c) Whether or not the *applicant possesses the competency and learning in the law* required for admission to practice law in the State of Oklahoma.... If the Trial Panel finds that such evidence is insufficient to establish the applicant's competency and learning in the law, it must require the applicant *to take and pass the regular bar examination* before a finding as to his qualifications shall be made in his favor." (Emphasis added.)

for her reinstatement, she must pay the costs incident to this disciplinary prosecution.

HODGES, C.J., LAVENDER, V.C.J., and SIMMS, HARGRAVE, SUMMERS and WATT, JJ., concur.

ALMA WILSON and KAUGER, JJ., concur in result.